CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
JUN 28 2012
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ADIB EDDIE RAMEZ MAKDESSI, | ) | CASE NO. 7:11CV00262 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | |
| | ) | |
| HAROLD W. CLARKE, ET AL., | ) | By: Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

Adib Eddie Ramez Makdessi, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that during his incarceration at Wallens Ridge State Prison,[1] the defendant prison officials failed to protect him from violence at the hands of his cellmate and other inmates, in violation of his constitutional rights. The defendants moved for summary judgment, and Makdessi responded, making the matter ripe for disposition. After reviewing the record, the court concludes that the motion for summary judgment must be granted in part and denied in part.

I

A. Plaintiff's Allegations and Evidence

Makdessi alleges in his complaint and various supplements that his cellmate raped and beat him severely over a three-hour period one morning and that the defendant officers either knew in advance the cellmate might harm Makdessi, or heard or saw evidence of the ongoing attack, but took no action to protect him. In the original verified complaint (ECF No. 1, pp. 2 & 4), Makdessi alleged that Wallens Ridge officials placed him in D-1 pod in a cell with a known "gangster d[isc]iple," Michael Smith. In early December 2010, Smith and his gang members

---

[1] Makdessi is now incarcerated at Keen Mountain Correctional Center.

stabbed Makdessi. Makdessi informed Sgt. King and Lt. Fields about the stabbing and told them he needed protection from Smith. Officers left Makdessi in the cell with Smith, however. On December 21, 2010, between 9:00 a.m. and noon, Smith raped and beat Makdessi in his cell, while several officers patrolled the area, and at times, looked into the cell, without intervening. During the assault, Smith called Makdessi a "snitch" and showed him a copy of a letter Makdessi had sent to the assistant warden a week before. Smith told Makdessi that Sgt. King had given copies of the letter to Smith and other gang members in the pod. Smith then tore up the letter, threw it in the cell's toilet, and told Makdessi, "I'm going to kill you."

During the three-hour assault, a gangster disciple leader identified as "K.C." came to the cell door and told Smith to clean Makdessi up for count. Another gangster named Flaco came by and told Smith to get Makdessi's television and commissary items ready for pick up with meal trays and trash. Flaco and a third gangster named Peety told Smith to "take his time." Smith cleaned blood off the floor with a cloth, threw water on Makdessi's face, body and buttocks, and then ordered him to clean himself with the floor cloth. During the assault, Officer Sumpter made security rounds every thirty minutes and looked into Makdessi's cell, but did nothing to stop the assault.[2] Officers also allowed the gangsters to move around the pod during the assault, although the pod was locked down.[3]

When officers opened the cell doors for removal of food trays and trash, Smith handed Makdessi's television to one of the gangsters outside the cell door. Makdessi ran out of the cell into the pod, and Smith and Flaco ran after him, caught him and beat him on the stairs. After an officer fired a gun, Makdessi ran away from his attackers. Makdessi tried to tell Capt. Gallihar,

---

[2] Makdessi originally identified this individual as Officer Sutner, but later amended to substitute Officer Timothy Sumpter. (ECF Nos. 35-36)

[3] Makdessi expanded on this allegation in his amendments, ECF Nos. 35-36).

2

Lt. Fields, and Sgt. King that he had told Lt. Fields the day before that his life was in danger and he needed protective custody, but the officers told him, "[S]hut the hell up– don't say a word." Officers placed Makdessi in cuffs and took him to the prison hospital, where medical staff treated his injuries. After Makdessi told the doctor that he had been raped, the doctor said he should be transported to an outside hospital for a rape kit. Two officers took Makdessi in the X-ray room, "started to TORTURE [him] by pushing on [his] broken ribs and all [his] wounds," and told him not to say a word to anyone at the hospital about Lt. Fields or Sgt. King, or "when you come back what happened to you is nothing compa[red] to what will happen." When officials returned Makdessi from the outside hospital, he remained in the prison hospital for a few weeks and was then placed in protective custody at Keen Mountain Correctional Center.

In his original complaint, Makdessi sued VDOC Director Harold Clarke and Sgt. King, Lt. Fields, Capt. Gallihar, and John Doe officers at Wallens Ridge. Makdessi set out three overlapping claims against these defendants: (1) after Makdessi told Sgt. King and Lt. Fields that Smith had stabbed him in December 2010, they failed to protect him from Smith; (2) when King and Fields failed to protect Makdessi after the stabbing, Smith raped and assaulted Makdessi on December 21, 2010; and (3) on December 21, 2010, officers saw evidence that the assault was occurring, but did not intervene. Makdessi alleged that during the assault, he was raped, punched in the face, and kicked in the head and ribs 50 to 90 times. He suffered two broken ribs, cuts over both eyes that required stitches, broken nose, and cut lips. For some time after the attack, he bled from his rectum whenever he used the bathroom. As a result of the incident, Makdessi allegedly suffered from amnesia, nightmares, and mental and emotional distress. Makdessi's complaint sought monetary damages of $25,000,000.

3

The defendants filed an answer and moved for summary judgment on the ground that Makdessi failed to exhaust administrative remedies.[4] (ECF Nos. 26-28, 70-71) In response to defendants' motion, Makdessi filed two pleadings in which he named additional officers as defendants and sought to expand on his factual allegations related to his claims. (ECF Nos. 35-36) The court construed these submissions as motions to amend and granted them. (ECF No. 37) In these pleadings, Makdessi added defendants Timothy Sumpter, David Bellamy, Glen Boyd, Thomas Hall, Brandon Woodward, Clarence Shupe, and Dennis Sluss, identifying these men as the officers assigned to D-1 pod on December 21, 2010. He alleged that these officers walked by his cell doing security checks during the time of the assault, but did not stop the assault, or that they knowingly allowed the gangsters out of their cells despite a lockdown because the officers wanted Makdessi dead. Makdessi also alleged that before the assault, the defendant officers threatened him with comments such as "[A] sand nigger Arab like you don't deserve to live of[f] tax payers in this prison and . . . someone should br[eak your] neck and take [you] out." (ECF No. 35, p. 2) Makdessi alleged that he filed grievances about such comments before December 21, 2010, but security officers, the warden, and Clarke "ignor[ed]" them.[5] (ECF No. 35, p. 2)

Makdessi also supplemented his allegations about reporting to King and Fields that Smith had stabbed him two weeks before the December 21, 2010 assault. When these officers did not move Makdessi away from Smith, Makdessi put his bloody shirt and underpants in an envelope

---

[4] The court denied defendants' motion for summary judgment under § 1997e(a) upon finding material facts in dispute as to whether prison officials interfered with Makdessi's attempts to exhaust administrative remedies. (ECF Nos. 68-69) The exhaustion issue remains a triable dispute that defendants may develop at trial.

[5] Makdessi alleges that he mailed copies of all his complaints and grievances to Clarke. (ECF No. 35, p. 8)

and addressed it to the "FBI." He planned to mail this evidence out of the prison on December 21, 2010, but he never saw the envelope again after the assault.[6] Makdessi also alleged that on December 20, 2010, he told Fields that his life was in danger and he needed protective custody, and that surveillance footage of D-1 pod will prove this encounter occurred.

## B. Defendants' Evidence

Defendants have moved for summary judgment, offering affidavits from the following individuals: Defendants Clarke, Gallihar, Fields, Hall, Sumpter, Bellamy, Boyd, King, and Investigator Yates. (ECF Nos. 82-83) Defendants offer evidence that VDOC officials do not place inmates in the same cell if they are known enemies. All of these defendants state that they were not aware before December 21, 2010 that Makdessi had any problems with Smith, who had been his cellmate since August of that year. They also deny making derogatory remarks about him. They offer the following additional evidence.

Capt. Gallihar was the Watch Commander on December 21, 2010, and was notified of the incident in D-1 pod only after it occurred. When Gallihar reported to D-1 pod, he saw Makdessi sitting on the floor with blood on his face. Gallihar asked Makdessi what happened, and Makdessi said he and his cellmate had been fighting for the last three hours and his cellmate had raped him. Based on this statement, Gallihar charged Makdessi with a disciplinary offense for fighting. Makdessi was convicted of this charge on January 3, 2011, and penalized with 14 days in isolation.

Lt. Fields was not in D-1 pod at the time of the incident on December 21, 2010, and arrived in that unit after Makdessi and Smith were separated and restrained. Fields denies any knowledge that Smith stabbed Makdessi in early December 2010. Fields states that there is no

---

[6] Makdessi has submitted a copy of a property confiscation notice, dated December 21, 2010, indicating that Investigator Yates removed a television and a package of legal work from Makdessi's cell. (ECF No. 74-1, p. 3)

5

record (serious incident report, disciplinary record, or medical record) of such a stabbing and that if one had occurred, officials would have separated Makdessi and Smith and conducted an investigation. Fields also has no recollection or record that Makdessi told him on December 20, 2010, that his life was in danger and he needed protective custody.

Officers B. Woodard, C. Shupe, and D. Sluss were night shift officers on December 21, 2010, and were not present at the facility when the incident in D-1 pod occurred that morning.

Officers Hall and Bellamy were floor officers in D-1 pod on December 21, 2010, and were responsible for making periodic security checks. Bellamy states that during one of his rounds, Makdessi called him over to the cell and asked how he was doing. Smith was on the top bunk, and Makdessi, who sitting on the bottom bunk, appeared fine and expressed no concerns. Bellamy was out of the pod on lunch break when Makdessi ran out of the cell. Hall remembers looking in Makdessi's cell on the top tier several times that morning, but did not notice anything unusual. Hall denies that any other inmates were outside Makdessi's top tier cell during the assault. Inmates would have been outside their own cells during this time only for in-pod recreation, which must be conducted on the bottom tier. Officers Hall and Bellamy state that they first became aware of the assault at 11:55 a.m., when Makdessi ran out of his cell, followed by Smith.

Officer Boyd was assigned to the D-1 control room on December 21, 2010, and Officer Sumpter was assigned to the gunman post. At approximately 9:45 a.m., Sumpter was called to the gun tower to assist with staff breaks there, so Boyd took over the gunman post, and Sgt. King took over control room operations.

At 11:55 a.m., when King was opening cell doors for offenders to set out their lunch trays and trash for collection, Makdessi ran out with blood on him and started down the stairs. Smith

6

followed and began striking Makdessi in the head and face with his fists. King announced on the radio that inmates were fighting in D-1 pod, and Boyd activated the pod's emergency buzzer. King began to close the cell doors, but before they all closed, two other inmates ran out and walked toward Smith and Makdessi. Boyd ordered these offenders to stop and return to their cells, but they refused. Boyd then fired a blank warning round from the shotgun assigned to the D-1 control room. Then, all offenders except Makdessi stopped what they were doing and lay on the ground. King denies that Makdessi ever complained to him about Smith or fearing for his life and denies giving any letter to gang members labeling Makdessi as a snitch.

At the hospital, medical staff applied the Physical Evidence Recovery Kit (PERK) to Makdessi. The resulting certificate of analysis indicated that no seminal fluid was present in the PERK test. No DNA profile foreign to Makdessi was found in the scrapings collected from under his fingernails after the altercation. When questioned by investigators, Smith denied raping Makdessi and denied all knowledge of the letter Makdessi described.

## II

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

7

## A. Defendants in their Official Capacities

Neither a state nor its officials acting in their official capacities are persons for purposes of § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). Therefore, to the extent that Makdessi is suing the defendants in their official capacities for monetary damages, they are immune from suit, and the court grants their motion for summary judgment as to all such claims.

## B. Eighth Amendment Claims

The Eighth Amendment obligates prison officials to take reasonable precautions to protect prisoners from violence at the hands of other prisoners. Farmer v. Brennan, 511 U.S. 25, 832-33 (1994) (omitting internal quotation marks). A prisoner alleging that prison officials have failed to keep him reasonably safe from other inmates must show that (i) objectively, the prisoner was incarcerated under conditions posing a substantial risk of serious harm and (ii) subjectively, the defendant was deliberately indifferent to those conditions. Id. at 834.

To establish that the risk of exposure to future harm violates the Eighth Amendment, the risk must be "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers." Helling v. McKinney, 509 U.S. 25, 33, 34-35 (1993). "[T]here must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" Baze v. Rees, 553 U.S. 35, 50 (2008) (quoting Farmer, 511 U.S. at 842, 846, and 847 n.9)).

A prisoner must also demonstrate that, subjectively, the prison official had a "sufficiently culpable state of mind," the deliberate indifference requirement. Farmer, 511 U.S. at 834. A prison official demonstrates deliberate indifference if he knows of an excessive risk to inmate health or safety and disregards or fails to respond reasonably to that risk. Id. at 844-45.

8

Liability under this standard thus requires two showings. First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers should have recognized it; they actually must have perceived the risk. Rich v. Bruce, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." Id. As with the subjective awareness element, it is not enough that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient. See Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001).

Although the deliberate indifference standard requires a showing of actual knowledge as to both elements, it "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842, 114 S. Ct. 1970. Thus, "a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that the risk was obvious." Id. But, it is not enough that a reasonable officer would have found the risk to be obvious. Rich, 129 F.3d at 339-40. Rather, the risk of injury must be "so obvious that the fact-finder could conclude that the [officer] did know of it because he could not have failed to know of it." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995). As the Supreme Court explained in Farmer, a plaintiff can make a prima facie case under this standard by showing "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it. . . ." 511 U.S. at 842, 114 S. Ct. 1970. See, e.g., Odom v. S.C. Dept. of Corr., 349 F.3d 765, 771 (4th Cir. 2003) (noting, in finding that the prison guards were aware of the risk to the plaintiff, that the guards previously and contemporaneously had been warned that the plaintiff's assailants would attack him if given the chance and had been instructed to remove plaintiff from his recreation cage in light of this risk). Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances.

Parrish v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis in original).

The three claims alleged in Makdessi's complaint are really the same claim against multiple defendants: that each of the defendants acted with deliberate indifference to a significant, known risk that Makdessi would be seriously harmed by his cellmate, Smith. Some of the defendants are entitled to summary judgment as to this Eighth Amendment claim.

9

### 1. Defendant Clarke

An official can be held liable under § 1983 in his individual capacity only if his "own individual actions . . . violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2008). "[T]here is no vicarious liability under § 1983." Revene v. Charles County Comm'rs, 882 F.2d 870, 874 (4th Cir. 1989).

Defendants argue that Clark, as VDOC director, is entitled to summary judgment, because Makdessi does not allege or state facts showing that Clarke had personal knowledge that Makdessi's housing assignment posed any significant risk of serious future harm. Makdessi alleges that he filed grievances asserting his need to be housed in a single cell, based on his past experiences being celled with known enemies, being sexually assaulted by cellmates, or being retaliated against by staff, and that he mailed copies of all his grievances to Clarke. Clarke states that he was not aware of any assault on Makdessi before this lawsuit. Clarke also states that his office mail logbook does not indicate that he received any complaints from Makdessi about staff at Wallens Ridge.

Makdessi fails to forecast any evidence on which he could show that Clarke actually received any of Makdessi's grievances or that Clarke by any other means knew that Makdessi's cellmate or staff at Wallens Ridge posed a significant risk of serious harm to him. Thus, Makdessi fails to establish a genuine issue of material fact as to the deliberate indifference element of his claim against this defendant. Makdessi cannot hold Clarke vicariously liable under § 1983 for violations allegedly committed by his subordinates. Iqbal, 129 S. Ct. at 1949. Therefore, the court will grant the motion for summary judgment as to Clarke.

### 2. Defendants B. Woodard, C. Shupe, and D. Sluss

Defendants argue that these night shift officers are entitled to summary judgment, because Makdessi states no facts showing that they had any personal knowledge that Smith posed a risk of harm to Makdessi before December 21, 2010, or that they were present in the pod during the assault that morning. The court agrees. Makdessi's allegations do not create any genuine issue of material fact from which a factfinder could reasonably infer that Defendants Woodard, Shupe, and Sluss were deliberately indifferent to any threat to Makdessi's safety on or before December 21, 2010.[7] The court will grant the motion for summary judgment as to these defendants.

### C. Defendants Fields, King, Gallihar, Sumpter, Bellamy, Boyd, and Hall

These defendants all deny any knowledge of a risk of harm to Makdessi. They argue that in the face of their evidence, Makdessi's submissions are insufficient to support a reasonable inference that any of these defendants knew before or during Smith's assault on Makdessi in his cell on December 21, 2010, that Makdessi was in danger of harm from his cellmate. Taking the evidence in the light most favorable to Makdessi, however, the court finds sufficient facts in dispute to preclude summary judgment for these defendants.

Makdessi alleges, in response to the summary judgment motion, that Fields, King, and Gallihar had received or talked to him regarding grievances Makdessi had filed before December

---

[7] Makdessi argues that as night shift officers, these defendants had the job of removing inmates' mail from the pod's mailbox and might have taken Makdessi's letter to the assistant warden and given it to King, who allegedly gave the letter to gang members, including Smith, to target Makdessi as a snitch. (ECF No. 92, p. 4) Makdessi also alleges, however, that King himself had a key to the mailbox, and he alleges no facts indicating that Woodard, Shupe, or Sluss had any personal interaction with King. These allegations are insufficient to state any actionable claim against these defendants. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (finding that to state claim, plaintiff must make sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . .") (internal quotation marks omitted).

11

21, 2010 about being sexually assaulted by all of his previous cellmates (ECF No. 92, pp. 1-2; 92-1, pp. 1-4), but failed to take steps to investigate or to assign Makdessi to a single cell or protective custody, as he requested. Makdessi alleges that he told Fields and King personally that Smith had stabbed him two weeks before the December 21, 2010 incident, but they took no action to investigate, to separate Makdessi and Smith, or to otherwise protect Makdessi. The court finds that Makdessi's allegations and evidence are sufficient to present disputed issues of material fact as to whether each of these defendants must have known facts before December 21, 2010, on which they must have perceived that housing Makdessi in the same cell with Smith created a substantial and imminent risk that Smith would cause Makdessi serious harm. Similarly, Makdessi's allegations, if credited, support a reasonable inference that these officers also knew their failure to move one of the cellmates constituted an unreasonable response to the risk.[8] Parris, 372 F.3d at 303. Accordingly, the court will deny the motion for summary judgment as to Defendants Gallihar, Fields, and King.

Makdessi alleges that Defendants Sumpter, Boyd, and King, who were in the control room for D-1 pod at different times on the morning of December 21, 2010, must have known at some point between 9:00 a.m. and 11:55 a.m. that Smith was assaulting Makdessi. Makdessi asserts that anyone in the control room, only 35 feet from Makdessi's cell, must have heard Makdessi crying out for help during the assault. (ECF No. 92, p. 3) He argues that anyone hearing those noises must have known that Smith was assaulting Makdessi in the cell, and must

---

[8] Makdessi also alleges that he learned from other inmates in May 2010 how King had tried to take out a contract to have members of the Bloods gang kill Makdessi, that Makdessi confronted King in a meeting with Fields about this contract attempt, and that on December 21, 2010, King and other officers purposely failed to intervene in Smith's assault or purposely let gangsters out of their cells to join in Smith's efforts to harm Makdessi. The court considers these allegations to be offered in support of Makdessi's claims that the defendants acted with deliberate indifference to known risks that Makdessi would be harmed by his cellmate and others. Defendants King and Fields deny that the contract attempt, and the meeting about the contract, ever occurred and deny that they had any knowledge of Smith's efforts to harm Makdessi until Makdessi ran out of his cell.

12

have known that failure to investigate and intervene in the fight was an inadequate response that left Makdessi at substantial risk of suffering serious harm. Taking Makdessi's allegations in the light most favorable to him as the nonmovant, the court finds that he has presented disputed issues of material fact as to whether these defendants knew that an assault was occurring and knew that their failure to intervene constituted an inadequate response to the risk that Makdessi would suffer ongoing harm. Id. Accordingly, the court will deny the motion for summary judgment as to Defendants Sumpter and Boyd.

Makdessi alleges that Defendants Bellamy and Hall, during their security rounds on December 21, 2010, must have seen the assault or its bloody aftermath in Makdessi's cell. He also alleges that they must have heard him crying and yelling loudly for help, but that they took no action to remove him from the cell to prevent Smith from continuing to harm him. (ECF No. 92, p. 6) The court finds Makdessi's allegations sufficient to present genuine issues of triable fact as to whether these defendants knew of an ongoing risk that Smith would cause Makdessi serious harm and knew that their failure to intervene was an unreasonable response to that risk. Id. The court denies the motion for summary judgment as to Defendants Bellamy and Hall.

**D. The Fight in the Pod**

Defendants King, Boyd, and Hall assert that they first became aware of the altercation between Smith and Makdessi at 11:55 a.m., when King opened the cell doors for lunch trays and trash, and Makdessi came out of his cell, bleeding. When Smith soon followed and began striking Makdessi with his fists, defendants assert that they reacted promptly and appropriately to this risk that Makdessi would be harmed, by announcing the fight, activating the emergency buzzer, locking up other inmates' cells, ordering the inmates to stop fighting, and finally, firing a warning shot and restraining the attackers. While defendants may be able to prove that they

13

responded reasonably, the court finds that Makdessi's allegations preclude summary judgment as to any of the defendants regarding the fight in the pod. If defendants knew between 9:00 and 11:55 a.m. that Smith was assaulting Makdessi in their cell, as Makdessi alleges, then defendants' failure to respond reasonably within that time period to protect Makdessi constituted deliberate indifference to any future risk, including the risk that Smith and the other inmates released from their cells would assault Makdessi in the pod area. Therefore, the court denies the motion for summary judgment as to Defendants Fields, King, Gallihar, Bellamy, Boyd, and Hall, as to Makdessi's claims that they failed to protect him from the risk that other inmates would harm him, both inside his cell and in the pod area, on December 21, 2010.

### C. Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223 (2009)). Qualified immunity involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that defendants' conduct violated a constitutional or statutory right; and if so, (b) whether that right was clearly established. Saucier, 533 U.S. at 206. If the court determines that the facts alleged, taken in the light most favorable to the nonmovant, do not show that the officer's conduct violated a constitutional right, then the movant is entitled to summary judgment without further discussion of qualified immunity. Id. at 201. Under the second prong of the qualified immunity analysis, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202.

14

Defendants Fields, King, Gallihar, Bellamy, Boyd, and Hall argue that they are entitled to qualified immunity because Makdessi's allegations do not support a claim that any of them knew before 11:55 a.m. on December 21, 2010 that Makdessi needed protection from his cellmate and other gang members.[9] The court has already found, however, that Makdessi's allegations are sufficient to present triable disputes on this material factual issue. If Makdessi's version of events is credited, then no reasonable officer could have believed it was lawful behavior not to take preventative measures before the assault, or not to intervene sooner in the ongoing assault, to abate the known risk that Makdessi would be seriously harmed. Just as these material disputes preclude summary judgment on Makdessi's Eighth Amendment claims, they also preclude a finding that defendants are entitled to summary judgment on the ground of qualified immunity. See Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992) (finding that district court properly denied defendant's immunity-based summary judgment motion because "a determination of what actually happened is absolutely necessary to decide whether[defendant] could reasonably have believed that his actions were lawful"); Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991) (finding summary judgment precluded where resolution of claim depends on credibility determination). Therefore, the court denies defendants' motion for summary judgment on the ground of qualified immunity.

### III

For the stated reasons, the court concludes that defendants' motion for summary judgment must be granted as to all claims against the defendants in their official capacities and as to all claims against Defendants H. Clarke, B. Woodard, S. Shupe, and D. Sluss, but that the motion must be denied as to plaintiff's Eighth Amendment claims against Defendants Lt. Fields,

---

[9] Because the court has already found that Defendants Clarke, Woodard, Shupe, and Sluss are entitled to summary judgment on the merits of Makdessi's Eighth Amendment claims, the court need not address arguments by these defendants that they are entitled to qualified immunity,

15

Sgt. King, Capt. Gallihar, Timothy Sumpter, David Bellamy, Glen Boyd, and Thomas Hall for failing to protect him from assaults by his cellmate, both in his cell and in the pod area on December 21, 2010. An appropriate order will enter this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER: This 28th day of June, 2012.

/s/ Glen Conrad
Chief United States District Judge